UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

IKB INTERNATIONAL S.A. IN          :
LIQUIDATION and IKB DEUTSCHE
INDUSTRIEBANK AG,                   :

                  Plaintiffs,   :   12 Civ. 4036 (LAK)(HBP)

   -against-                       :   REPORT AND
                                        <u>RECOMMENDATION</u>
BANK OF AMERICA CORPORATION;        :
BANK OF AMERICA, N.A.; MERRILL
LYNCH, PIERCE, FENNER & SMITH,      :
INC., f/k/a "Banc of America
Securities LLC;" MERRILL            :
LYNCH & CO., INC.; MERRILL
LYNCH MORTGAGE INVESTORS, INC.;     :
MERRILL LYNCH MORTGAGE CAPITAL,
INC. and ASSET BACKED FUNDING       :
CORPORATION,
                                    :
                Defendants.
                                    :
----------------------------------X


      PITMAN, United States Magistrate Judge:


      TO THE HONORABLE LEWIS A. KAPLAN, United States

District Judge,


I.  <u>Introduction</u>


      In principal part, this is a common law fraud action

brought by the assignee of a purchaser of $ 56,188,000 worth of

residential mortgage-backed securities ("RMBS") in seven differ-

ent trusts.  Stated briefly, plaintiffs allege that defendants

engaged in a pervasive scheme to defraud investors by overstating the quality of the mortgages that were deposited in the trust; it was the income from these mortgages that was to be distributed to the purchasers of the trust certificates and was to provide a return for the investors.  According to plaintiffs, defendants' overstatement of the quality of the mortgages enabled the defendants to sell the securities for far more than they were actually worth.  Plaintiffs also assert alternative claims for negligent misrepresentation, fraudulent concealment and aiding and abetting.

By notice of motion dated November 30, 2012 (Docket Item 14), all defendants move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint on the grounds that it is time-barred and fails to state a claim on which relief can be granted.  Alternatively, defendants move to dismiss the complaint on the ground that it fails to allege fraud with particularity as required by Fed.R.Civ.P. 9(b).

For the reasons stated below, I respectfully recommend that defendants' motion be granted.

II.  Facts

A.  RMBS Securitizations

The complaint alleges that RMBS are created and sold to the investing public through the following process.

RMBS securitizations refer to the process by which thousands of residential mortgages are pooled together in a trust which then issues investment certificates backed by the loans. In return for their investments, holders of the certificates receive the income stream generated by the loans (Compl. ¶ 40).

The first step in the process involves a party known as an "originator."  The originator makes the loan to the mortgagor and receives the mortgagor's note and mortgage.  Ths originator, in turn sells the notes and accompanying mortgages to the invest-ment bank arranging the securitization, also known as a "sponsor" or "seller."  The sponsor, in turn, sells the loans to a "deposi-tor."  The sponsor and the depositor are both deemed "issuers" of the RMBS certificates (Compl. ¶ 41).

Not all originators are banks, and some non-bank originators require a source of funds in order to make the loans to the mortgagors.  Originators that need funds to make loans can sometimes secure credit from "warehouse lending facilities." According to plaintiffs, an entity providing warehouse lending

facilities ordinarily performs extensive due diligence research with respect to originating lenders that are seeking such credit in order to ensure that the originating lender is sufficiently credit worthy (Compl. ¶ 42).

When a sponsor or seller acquires loans from an originator, it also receives the individual loan files that  contain the mortgagors' loan applications and supporting documentation (Compl. ¶ 43).

According to plaintiffs, before a RMBS securitization closes, the sponsor will conduct a due diligence review of the loan files to ensure that they meet the issuer's quality criteria.  This review may be conducted by a third-party retained by the issuer, by the issuer itself or by both.  Among other things, this due diligence review examines the originators' appraisals of the property, the resulting loan to value ("LTV") ratios, whether the properties will be occupied by the borrower, the borrowers' debt-to-income ratios and other factors the issuer deems relevant (Compl. ¶ 44).  The offering documents make representations concerning the quality of the loans on the basis of this due diligence review (Compl. ¶ 46).  These representations routinely include such matters as the LTV and the combined LTV ("CLTV") of the loans, the percentage of properties that are owner occupied, whether certain underwriting guidelines have been followed and a

statement that the loans and the mortgages will be assigned to the issuing trust at the closing (Compl. ¶ 46).  Loans that do not meet the issuer's underwriting criteria may, nevertheless, be included in the securitization (or "waived in") if the issuer concludes there are adequate compensating factors (Compl. ¶ 45).

Prior to the actual issuance of trust certificates, the notes and mortgages are ordinarily transferred to the issuing trust (Compl. ¶ 47).

B.  Defendants'
    Alleged Wrongdoing

Plaintiff IKB International S.A. ("IKB SA") is a commercial bank, currently in liquidation, with its main office in Luxembourg (Compl. ¶ 27).  IKB Deutsche Industriebank AG ("IKB AG") is a commercial bank incorporated in Germany with its main office in Germany (Compl. ¶ 28).  There is no allegation that IKB AG itself purchased any certificates.  Rather it sues in its capacity as the assignee of IKB SA, having purchased the certificates from IKB SA on November 20, 2008 (Compl. ¶ 38).

Between August 2005 and November 2006, IKB SA made the following purchases of RMBS from the indicated sellers:

| Deal Name and Tranche | Trade Date | Issue Date | Counter-Party | Amount Invested |
|---|---|---|---|---|
| SURF 05-AB2 A1C | 08/24/05 | 09/15/05 | Merrill Lynch & Co. | $8,060,000 |

| | | | | |
|---|---|---|---|---|
| CBASS 05-CB6 M1 | 09/23/05 | 09/30/05 | Merrill Lynch & Co. | $6,500,000 |
| CBASS 05-CB6 M5 | 09/23/05 | 09/30/05 | Merrill Lynch & Co. | $2,750,000 |
| MLMI 05-SL3 M1 | 11/01/05 | 11/10/05 | Merrill Lynch & Co. | $8,000,000 |
| CBASS 06-CB6 M4 | 07/26/06 | 07/31/06 | Bank of America Securities LLC | $6,000,000 |
| CBASS 06-CB6 M5 | 07/26/06 | 07/31/06 | Bank of America Securities LLC | $3,000,000 |
| ABFC 06-OPT1 M7 | 08/07/06 | 08/10/06 | Bank of America Securities LLC | $2,000,000 |
| ABFC 06-OPT1 M8 | 08/07/06 | 08/10/06 | Bank of America Securities LLC | $1,750,000 |
| CBASS 06-CB8 M4 | 10/18/06 | 10/30/06 | Merrill Lynch & Co. | $2,600,000 |
| CBASS 06-CB8 M5 | 10/18/06 | 10/30/06 | Merrill Lynch & Co. | $2,200,000 |
| CBASS 06-CB8 M7 | 10/18/06 | 10/30/06 | Merrill Lynch & Co. | $5,328,000 |
| ABFC 06-OPT3 M4 | 11/03/06 | 11/14/06 | Bank of America Securities LLC | $3,000,000 |
| ABFC 06-OPT3 M5 | 11/03/06 | 11/14/06 | Bank of America Securities LLC | $5,000,000 |
| | | | **TOTAL** | **$56,188,000** |

(Compl. ¶ 39).

As discussed in greater detail below, plaintiffs allege that the offering documents issued in connection with the foregoing securitizations contain material misrepresentations

6

concerning the LTV ratios, combined LTV ratios, owner occupancy rates, whether the loans complied with the originators' under-writing guidelines and whether the notes and mortgages had actually been assigned to the trust.

Defendants argue that the claims are time-barred, that the complaint fails to state a fraud claim because it does not allege (1) falsity with respect to (a) LTV and combined LTV ratios, (b) owner occupancy rates, (c) transfer of the notes and mortgages and (d) compliance with the originators' underwriting guidelines; (2) scienter, (3) reasonable reliance and (4) loss causation. Defendants also allege that the complaint fails to state claims for negligent misrepresentation and fraudulent concealment because it does not allege the requisite relationship between plaintiffs and defendants and fails to state a claim for aiding and abetting fraud because, among other things, it fails to state a claim for fraud.[1]

---

[1] In their reply memorandum of law, defendants also claim for the first time that plaintiffs have failed to allege standing adequately (Defendants' Reply Memorandum of Law in Support of their Motion to Dismiss the Complaint, dated Mar. 8, 2013 (Docket Item 22) at 1-2). Although defendants' opening memorandum of law identifies an issue concerning standing, it does not seek dismissal on this ground and appears to concede that IKB AG has standing (Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, dated Nov. 30, 2012 (Docket Item 15) ("Defs.' Mem.") at 7). Because defendants first sought dismissal for lack of standing in their reply memorandum of law,

(continued...)

III.  <u>Analysis</u>

A.  Applicable
    <u>Legal Standards</u>

The standards applicable to a motion to dismiss pursuant to Rule 12(b)(6) are well settled and require only brief review.

> The Supreme Court has established a two-step process for determining whether a plaintiff has pled sufficient facts to overcome a motion to dismiss.  A court must first ignore "mere conclusory statements" or legal conclusions, which are not entitled to the presumption of truth.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  Then, assuming the veracity of the remaining facts, "a complaint must contain sufficient factual matter . . . to 'state a claim [for] relief that is plausible on its face.'"  <u>Id</u>. (quoting <u>Twombly</u>, 550 U.S. at 570, 127 S.Ct. 1955).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the <u>reasonable</u> inference that the defendant is liable for the misconduct alleged."  <u>Id</u>. (emphasis added).  While this plausibility standard is not "akin to a 'probability requirement,'" it "asks for more than a sheer possibility that a defendant has acted unlawfully."  <u>Id</u>. (quoting <u>Twombly</u>, 550 U.S. at 556, 127 S.Ct. 1955).  Pleading facts that are "'merely consistent with' a defendant's liability"

---

[1](...continued)
and plaintiffs have had no opportunity to respond to it, I do not consider the issue.  <u>China Nat. Chartering Corp. v. Pactrans Air & Sea, Inc.</u>, 882 F. Supp. 2d 579, 605 (S.D.N.Y. 2012) (Kaplan, D.J.); <u>Estate of Ungar v. Palestinian Auth.</u>, 451 F. Supp. 2d 607, 611 (S.D.N.Y.2006) (McMahon, D.J.)

is insufficient. Id. (quoting Twombly, 550 U.S. at
557, 127 S.Ct. 1955).

Pungitore v. Barbera, 506 F. App'x 40, 42 (2d Cir. 2012); see
also Allen v. Norman, Docket No. 12-3780-cv, 2013 WL 6670681 at
*1 (2d Cir. Dec. 19, 2013) (summary order); Virgil v. Town of
Gates, 455 F. App'x 36, 37 (2d Cir. 2012) (summary order); Smith
v. NYCHA, 410 F. App'x 404, 405-06 (2d Cir. 2011) (summary
order).

   "[T]he complaint is deemed to include any written
instrument attached to it as an exhibit or any statements or
documents incorporated in it by reference.  Even where a document
is not incorporated by reference, the court may nevertheless
consider it where the complaint relies heavily upon its terms and
effect, which renders the document integral to the complaint."
Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006),
quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d
Cir. 2002).  In ruling on a motion to dismiss, the court is
also permitted to consider matters that are judicially notice-
able.  See Bryant v. New York State Educ. Dep't, 692 F.3d 202,
208 (2d Cir. 2012); Hoffenberg v. Bodell, 01 Civ. 9729 (LAP),
2002 WL 31163871 at *3 (S.D.N.Y. Sept. 30, 2002) (Preska, D.J.)
("The Court also may consider 'matters of which judicial notice

9

may be taken.'"), quoting Leonard F. v. Israel Dis. Bank of New
York, 199 F.3d 99, 107 (2d Cir. 1999).

Although the statute of limitations is an affirmative
defense, it can be raised through a 12(b)(6) motion if the
factual bases for the defense appear on the face of the com-
plaint.  Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406,
425-26 (2d Cir. 2008).

Where, as here, the complaint alleges fraud,
Fed.R.Civ.P. 9(b) requires that the claim be alleged with partic-
ularity.  "A securities fraud complaint based on misstatements
must (1) specify the statements that the plaintiff contends were
fraudulent, (2) identify the speaker, (3) state where and when
the statements were made, and (4) explain why the statements were
fraudulent."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d
87, 99 (2d Cir. 2007), citing Novak v. Kasaks, 216 F.3d 300, 306
(2d Cir. 2000); accord Sinay v. CNOOC Ltd., No. 13-2240-cv, 2014
WL 350055 at *1 (2d Cir. Feb. 3, 2014) (summary order); Cohen v.
S.A.C. Trading Corp., 711 F.3d 353, 359 (2d Cir. 2013); Woori
Bank v. Citigroup Inc., 12 Civ. 3868 (LTS), 2013 WL 1235648 at *4
(S.D.N.Y. Mar. 27, 2013) (Swain, D.J.).  "[W]here, as here,
multiple defendants are asked to respond to allegations of fraud,
the complaint should inform each defendant of the nature of his
[or her] alleged participation in the fraud."  In re Parmalat

Secs. Litig., 479 F. Supp. 2d 332, 340 (S.D.N.Y. 2007) (Kaplan, D.J.) (inner quotation marks omitted); accord In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 695 (2d Cir. 2009) ("In a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible.").

    B.  Defendants' Arguments

        1.  Timeliness of
            the Complaint

       Defendants first contend that the German statute of limitations is applicable to this case and that, under German law, the claims are untimely.

       Because the Court's subject matter jurisdiction in this case is predicated on diversity of citizenship, the Court is bound to apply New York law, including New York's choice of law rules.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Martinez v. Bloomberg LP, 740 F.3d 211, 230 (2d Cir. 2014) (Newman, Cir. J., concurring); In re Coudert Bros. LLP, 673 F.3d 180, 186-87 (2d Cir. 2012).

       With respect to claims accruing on behalf of non-residents outside the state, Section 202 of New York's Civil Practice Law and Rules provides the choice of law rule and

operates to bar a claim by a non-resident of New York if the claim is barred by either the New York statute of limitations or the statute of limitations of the jurisdiction in which the claim accrued.[2]  Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc., 12 Civ. 4025 (AT), 2013 WL 6667601 at *5 (S.D.N.Y. Dec. 17, 2013) (Torres, D.J.); accord Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 528, 715 N.E.2d 482, 484, 693 N.Y.S.2d 479, 480 (1999).

Where, as here, a claim is based on financial injury, the claim accrues "where the plaintiff resides and sustains the economic impact of the loss."  Global Fin. Corp. v. Triarc Corp., supra, 93 N.Y.2d at 529, 715 N.E.2d at 485, 693 N.Y.S.2d at 482; accord Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq, 79 F. Supp. 2d 374, 389 (S.D.N.Y. 2000) (Kaplan, D.J.); see also Gorlin v. Bond Richman & Co., 706 F. Supp. 236, 240

---

[2]Section 202 provides:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

(S.D.N.Y. 1989) (Sprizzo, D.J.).  Defendants argue that the fraud

claims should be governed by the law of Germany, IKB AG's resi-

dence, and contend that under German law, the claims are un-

timely.  Defendants make no claim that IKB SA's residence is

anywhere other than Luxembourg, and with one exception discussed

below, they do not contend that the claims are time-barred under

the laws of New York or Luxembourg.

The flaw in defendants' argument is that when a claim

has been assigned, the Section 202 analysis focuses on the

statute of limitations of the jurisdiction in which the claim

accrued to the assignor, not the law of the assignee's residence.

> As Dean [and later Judge Joseph M.]
> McLaughlin has observed, "(I)f the cause of
> action accrues to a non-resident who later
> assigns the claim to a New York resident, the
> borrowing statute will apply.  In other
> words, the assignor's residence is crucial for
> purposes of the borrowing statute."  Practice
> Commentary C202:3 (1979), at N.Y.C.P.L.R. §
> 202 (McKinney Supp. 1979-1980).  See U. S.
> Fidelity & Guaranty Co. v. E. W. Smith Co., 46
> N.Y.2d 498, 504, 387 N.E.2d 604, 607, 414
> N.Y.S.2d 672, 675 (1979) ("The critical factor
> is . . . the residency of the person in whose
> favor the cause of action accrued.") (citation
> omitted).

Gluck v. Amicor Inc., 487 F. Supp. 608, 612 (S.D.N.Y. 1980)

(Werker, D.J.); accord Maiden v. Biehl, 582 F. Supp. 1209, 1213

(S.D.N.Y. 1984) (Stewart, D.J.); Portfolio Recovery Assocs. v.

King, 14 N.Y.3d 410, 416, 927 N.E.2d 1059, 1061, 901 N.Y.S.2d

575, 577 (2010); Windsearch, Inc. v. Delafrange, 90 A.D.3d 1223,

1224, 934 N.Y.S.2d 576, 577 (3rd Dep't 2011).  The foregoing rule
clearly makes sense; were the rule otherwise, a claim otherwise
time-barred by virtue of Section 202 could be revived by the
simple expedient of assigning it to a party residing in a juris-
diction with a statute of limitations longer than that in the
assignor's residence (but shorter than New York's limitation
period).

      Defendants' efforts to overcome these authorities are
unconvincing.  Defendants argue that "[p]ublic filings in Germany
confirm that IKB AG bore the costs of its fully-owned subsidiary
[IKB SA's] investments and directly financed [IKB SA's] obliga-
tions" (Defs.' Mem. at 7).  Apart from being based on material
that is beyond the face of the complaint and neither integral nor
judicially noticeable,[3] the argument violates the fundamental
principal of corporate law that, at least in the absence of
disregard of corporate formalities, parent corporations are
separate from their subsidiaries, even their wholly-owned subsid-

---

      [3]Defendants cite <u>Staehr v. Hartford Fin. Servs. Grp., Inc.</u>,
<u>supra</u>, 547 F.3d at 425-26 for the proposition that public filings
are properly considered on a motion to dismiss.  The language in
<u>Staehr</u> is not as broad as defendants represent.  In <u>Staehr</u>, the
Court of Appeals noted that publicly filed documents are
judicially noticeable for the purpose of establishing that the
information in those documents was publicly available.  547 F.3d
at 426.  <u>Staehr</u> does not stand for the proposition that the
contents of publicly filed documents are, <u>ipso facto</u>, judicially
noticeable for the truth of the matters stated therein.

iaries.  See generally United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." (inner quotations and citations omitted)).

Defendants next suggest that IKB AG is the injured party because it insured any obligations that IKB SA was unable to fulfill as a result of its weakened financial condition (Defs.' mem. at 7).  Defendants do not explain how IKB AG's potential liability on obligations unrelated to the RMBS purchases in issue in this case somehow converts the location of the loss in issue here to IKB AG's residence.  This argument also relies on matters outside the pleadings.

The single case on which defendants rely is factually distinguishable.  In Beana v. Woori Bank, 05 Civ. 7018 (PKC), 2006 WL 2935752 (S.D.N.Y. Oct. 11, 2006) (Castel, D.J.), the parent -- a Belgium corporation -- alleged that it made direct payments to defendants in connection with the specific transactions at issue in the action.  Although the transactions involved the parent's subsidiary corporation, the Honorable Kevin P. Castel, United States District Judge, found that the direct involvement of the parent in the transaction in issue rendered the parent's residence relevant for purposes of assessing where

the claim accrued.  2006 WL 2935752 at *7.  In contrast, there
are no allegations here that IKB AG had any involvement in the
purchase of the RMBS in issue.

Finally, defendants argue that even if the location of
plaintiff's injury is Luxembourg, the claims related to the MLMI
2005-SL3 securitization should be dismissed because they are
untimely even under New York law (Defs.' Mem. at 11 n.8).

New York provides that a claim for fraud must be
brought within "the greater of six years from the date the cause
of action accrued or two years from the time the plaintiff or the
person under whom the plaintiff claims discovered the fraud, or
could with reasonable diligence have discovered it."  N.Y.
C.P.L.R. § 213(8).  This action was commenced in New York State
Supreme Court on May 14, 2012 and was subsequently removed to
this Court.  Defendants argue that because the offering documents
for the MLMI 2005-SL3 securitization were issued on November 8,
2005 -- more than six years before the action was commenced --
and plaintiffs could have discovered the fraud more than two
years before the action was commenced, claims concerning this
securitization are time-barred even under New York law (Defs.'
Mem. at 11 n.8).

Defendants have again based their argument on material
that cannot properly be considered on a motion to dismiss.

16

Defendants claim that plaintiffs should have been aware of the facts giving rise to their claims no later than July 2007 when a German court issued a verdict in a criminal prosecution of IKB AG's former chief executive officer (Defs.' Mem. at 9-10, citing Ex. 10 to the Declaration of Shiwon Choe, Esq., dated Nov. 30, 2012 (Docket Item 16)("Choe Decl.")). Findings of fact in a judicial proceeding are not judicially noticeable. Walker v. Woodford, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006), aff'd on other grounds, 393 F. App'x 513 (9th Cir. 2010). Thus, the decision of the German court cannot be considered at this time. Defendants offer nothing else to support their contention that plaintiffs were on notice of the pertinent facts more than two years before the commencement of this action.

Accordingly, to the extent defendants claim that the action should be dismissed as untimely, their motion should be denied.

2. Falsity of the
   LTV and CLTV Ratios

Defendants next argue that the complaint should be dismissed because it fails to allege adequately that the LTV and CLTV ratios were false.

17

As its name implies, an LTV ratio express the relation-
ship between the size of a loan and the value of the property
securing the loan.  Tsereteli v. Residential Asset Securitization
Trust 2006-A8, 692 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) (Kaplan,
D.J.).  As the ratio decreases, the value of the property in
excess of the loan increases, indicating greater security.  As
the ratio increases, the opposite is true, and an LTV ratio in
excess of 1.00 indicates that the value of the mortgaged property
is less than the value of the loan (Compl. ¶¶ 66-67, 69).
Defendants contend that the complaint does not adequately allege
falsity of the LTV and CLTV ratios for two reasons:  (1) the LTV
and CLTV ratios are based on appraisals which are merely state-
ments of opinions that were disclosed as being potentially
inaccurate and (2) plaintiffs have not adequately alleged that
the LTV and CLTV ratios were, in fact, false or inaccurate
(Defs.' Mem. at 12-16).

Plaintiffs base their claim that the LTV and CLTV
ratios are false on their own investigation of samples of the
loans included in the securitizations.  Plaintiffs allege that
their investigation disclosed the following:

18

| Trust | Reported Percentage of Loans in Securitization with CLTV or LTV over 100% | Actual Percentage of Original Amount of Loans Sampled with CLTV or LTV over 100% based on the automated valuation model ("AVM") | Percentage of Loans Sampled where the Offering Documents Understated CLTV or LTV by more than 10 Percentage Points |
|---|---|---|---|
| ABFC 06-OPT1 | 0% (Prospectus Supplement ("Pro. Supp.") at S-12) | 42.1% | 39.9% |
| ABFC 06-OPT3 | 0.32% (Pro. Supp. at A-3) | 70.2% | 39.8% |
| CBASS 05-CB6 | 0.06% (Pro. Supp. at S-21) | 19.5% | 28.3% |
| CBASS 06-CB6 | 0.91% (Pro. Supp. at A-5) | 32.2% | 38.1% |
| CBASS 06-CB8 | 0% (Pro. Supp. at A-II-3) | 42.5% | 45.1% |
| MLMI 05-SL3 | 0% (Pro. Supp. at S-25) | N/A | N/A |
| SURF 05-AB2 | 0% (Pro. Supp. at S-10) | 22.2% | 30.6% |

(Compl. ¶ 79)

| Trust | Reported Weighted Avg. CLTV/LTV (Pro Supp.) | Weighted Avg. CLTV/LTV of Loans Sampled as Represented in Pro. Supp. | Actual Weighted Avg. CLTV/LTV of Loans Sampled Using AVM | Percentage Points by which Reported Weighted Avg. CLTV/LTV was Understated in Pro. Supp. Based on the Sample |
|---|---|---|---|---|
| ABC 06-OPT-1 | 82.3% (Pro. Supp. at S-12) | 85.2% | 93.9% | 8.7 |
| ABFC 06-OPT3 | 98.13% (Pro. Supp. at A-3) | 98.2% | 106.9% | 8.7 |
| CBASS 05-CB6 | 81.08% (Pro. Supp. at S-21) | 81.5% | 88.2% | 6.7 |
| CBASS 06-CB6 | 78.05% (Pro. Supp. at A-5) | 79.3% | 88.8% | 9.5 |

| | | | | |
|---|---|---|---|---|
| CBASS 06-CB8 | 83.27% (Pro. Supp. at A-II-3) | 84.6% | 95.3% | 10.7 |
| MLMI 05-SL3 | 97.23% (Pro. Supp. at S-25) | N/A | N/A | N/A |
| SURF 05-AB2 | 81.96% (Pro. Supp. at S-10) | 82.1% | 90.1% | 8.0 |

(Compl. ¶ 82). Plaintiffs claim that the foregoing ratios were understated because the ratios' denominators -- the appraised values of the properties -- were overstated.

However, the offering documents for all the securitizations contain language explicit warning investors that the accuracy of the appraisals was unknown.[4]

---

[4]For example, the offering documents for the ABFC 2006-OPT1 and ABFC 2006-OPT3 securitizations contained the following disclaimer:

> Option One recognizes that an appraised value is an opinion . . . . There can be no assurance that the value of a mortgaged property estimated in any appraisal or review is equal to the actual value of such mortgaged property at the time of such appraisal or review.  Furthermore, there can be no assurance that the actual value of a mortgaged property has not declined subsequent to the time of such appraisal or review.

(Choe Decl. Ex. 1 at S-42, Ex. 2 at S-36).

Similarly, the offering documents for the C-BASS 2005-CB6 and CBASS 2006-CB6 securitizations contained the following disclaimers:

> ***Appraisals May Be Inaccurate.***  In acquiring owner-financed mortgage loans, the seller assesses the value of a property, generally using either a prior appraisal (if completed within one year of the seller's
> (continued...)

"[R]eal estate appraisals are not statements of fact but rather statements of opinion or belief.  They are actionable . . . only if the complaint alleges that the appraiser did not truly believe the appraisal at the time it was issued."  <u>In re IndyMac Mortg. Backed Secs. Litig.</u>, 718 F. Supp. 2d 495, 511 (S.D.N.Y. 2010) (Kaplan, D.J.); <u>accord</u> <u>Fait v. Regions Fin. Corp.</u>, 712 F. Supp. 2d 117, 121 & 122 n.38 (S.D.N.Y. 2010) (Kaplan, D.J.), <u>aff'd</u>, 655 F.3d 105 (2d Cir. 2011); <u>Tsereteli v. Residential Asset Securitization Trust 2006-A8</u>, <u>supra</u>, 692 F. Supp. 2d at 393; <u>see</u> <u>Va. Bankshares, Inc. v. Sandberg</u>, 501 U.S.

---

[4](...continued)
  purchase of the mortgage loan), which generally must be
  re-certified, or a drive-by appraisal.  A drive-by
  appraisal is not as accurate as a full real estate
  appraisal because the appraiser does not have access to
  the interior of the mortgaged property and may not have
  access to the rear of the mortgaged property.  As a
  result, the appraisal may reflect assumptions the
  appraiser made regarding the interior or the rear of
  the mortgaged property which may not be accurate.  To
  the extent the seller has over-appraised the value of a
  property, such amount may not be recovered during a
  liquidation proceeding.

     *  *  *

  [A]ppraisal was based on the appraiser's judgment of
  values, giving appropriate weight to both the then
  market value of comparable homes and the cost of
  replacing the property.

(Choe Decl. Ex. 3 at S-8, S-28, Ex. 4 at S-27; <u>see</u> <u>also</u> Choe
Decl., Ex. 5 at S-29, Ex. 6 at S-30 and Ex. 7 at S-16 ).

1083, 1092-96 (1991) (an opinion is actionable under the federal securities laws only if it is both (1) objectively untrue and (2) believed to be untrue by the speaker).  Indeed, the examples of the cautionary statements quoted in footnote 4 expressly warned prospective investors that appraisals are only statements of opinion.

The complaint alleges that defendants were aware that their appraisals were inaccurate based on their own due diligence review and the due diligence review performed by Clayton (Compl. ¶¶ 83, 84).  The complaint does not identify the specific facts that were discovered by defendants or Clayton that would have lead defendants to believe that the appraisals were inflated.

Plaintiffs' vague allegations are insufficient to allege that defendants knew the appraisals and resulting LTV and CLTV ratios were inaccurate because they do not identify what was discovered in the due diligence review that provided defendants with knowledge.  Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc., supra, 2013 WL 6667601 at *21; Fed. Hous. Fin. Agency v. JPMorgan Chase & Co., 902 F. Supp. 2d 476, 493 (S.D.N.Y. 2012) (Cote, D.J.).  "[A]n allegation that defendants had access to information that was inconsistent with their alleged misstatements must specifically identify the reports or statements containing this information."  Landesbank

22

<u>Baden-Wurttemberg v. Goldman, Sachs & Co.</u>, 478 F. App'x 679, 682
(2d Cir. 2012) (citations & internal quotation marks omitted).

Although they do not allege it in their complaint,
plaintiffs argue in their memorandum of law that defendants
knowledge of the falsity of the LTV and CLTV ratios can be
inferred from the large number of substantial differences between
the LTV and CLTV ratios represented in the offering documents and
the ratios calculated by plaintiffs (Plaintiffs' Memorandum of
Law in Opposition to Motion to Dismiss, dated February 1, 2013
(Docket Item 18) ("Plaintiffs' Mem.") at 9).[5]

Although "the magnitude of inaccuracy can sometimes
provide circumstantial evidence that a fraud defendant made her
false statement knowingly or recklessly . . . such evidence must
be supported by additional circumstantial evidence in order for
the plaintiff to carry her pleading burden, particularly where
the originator of the false information is a third-party." <u>Fed.
Hous. Fin. Agency v. JPMorgan Chase & Co.</u>, <u>supra</u>, 902 F. Supp. 2d
at 493 (citations omitted); <u>accord Deutsche Zentral-</u>

---

[5]Specifically, plaintiffs state in their memorandum of law:
"Defendants' knowledge of the deliberate inflation of this
appraisal-based data is directly inferrable from . . .
[p]laintiff's loan-level investigation of the specific
Securitizations at issue in this litigation showing that the
Certificates [p]laintiffs purchased were supposedly backed by
non-conforming loans" (Plaintiffs' Mem. at 9).

<u>Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.</u>, <u>supra</u>, 2013 WL 6667601 at *20.  Plaintiffs offer no such corroborating circumstantial evidence here, and therefore, this theory is insufficient to sustain the allegation of defendants' knowledge.

To the extent plaintiffs allege that defendants' knowledge can be inferred from generally fraudulent practices in the RMBS industry (Compl. ¶ 145), these allegations are also insufficient because they are not connected to the particular securitizations in issue.  <u>Republic Bank & Trust Co. v. Bear Stearns & Co.</u>, 683 F.3d 239, 257 (6th Cir. 2012) (allegations of inaccurate property valuations "not connect[ed] to the loans and securities involved in this case" fail to satisfy Rule 9(b)); <u>Footbridge Ltd. v. Countrywide Home Loans. Inc.</u>, 09 Civ. 4050 (PKC), 2010 WL 3790810 at *13 (S.D.N.Y. Sept. 28, 2010) (Castel, D.J.).

Finally, defendants also argue that the complaint does not allege that the appraisals are, in fact, false.  Defendants argue that all the complaint alleges is that plaintiffs' valuations, based on an AVM method, are different, but not necessarily correct valuations (Defs.' Mem. at 14).

Although real estate appraisals are inherently subjective and matters of opinion, they can, nevertheless, be objectively incorrect.  <u>See generally</u> <u>Homeward Residential, Inc. v.</u>

Sand Canyon Corp., 12 Civ. 7319 (AT), 2014 WL 572722 at *13
(S.D.N.Y. Feb. 14, 2014) (Torres, D.J.).  For example, no one
could reasonably appraise a newly-renovated five-story brownstone
on Manhattan's upper east side at a value of $500.00, just as no
one could reasonably appraise a 50-year-old, one-family frame
house in a remote area of one of New York City's outer boroughs
at a value of $50 million.  Although a range of appraisals can
validly be made with respect to any parcel of real property,
there are limits to that range beyond which the appraisal is
unquestionably incorrect.  The problem with defendants' argument
is that it implies that almost all valuation opinions could not
be the basis of a fraud claim.  If defendants' argument were
accepted any claim that a defendant's valuation is false could
always be attacked by arguing that the claim of falsity is
predicated on merely a different valuation, but not necessarily a
correct valuation.  Such a result is troublesome because an
appraisal can be objectively wrong.

AVM valuations have been accepted at the pleading stage
as an adequate basis for alleging the falsity of a defendant's
valuation, F.D.I.C. v. Chase Mortgage Finance Corp., 12 Civ. 6166
(LLS), 2013 WL 5434633 at*8 (S.D.N.Y. Sept. 27, 2013) (Stanton,
D.J.) (claims under Sections 11 and 15 of Securities Act); In re
Countrywide Financial Corp. Mortgage-Backed Secs. Litig., 932 F.

Supp. 2d 1095, 1107-10  (C.D. Cal. 2013) (common law fraud), the
Judges in both cases noting that resolution of the accuracy of
the AVM valuation is better left for trial.  I conclude that this
is the more reasonable result because it does not imply that a
representation as to the value of a piece of real property can
never be actionable.  Thus, I decline to recommend that the
complaint be dismissed on the ground that the use of an AVM is
always insufficient to allege the falsity of an appraisal.

Nevertheless, for the other reasons set forth above, I
recommend that the complaint be dismissed to the extent that it
alleges falsity with respect to the LTV and CLTV ratios.

### 3.   Falsity of Owner Occupancy Rates

Defendants next contend that the complaint does not
adequately allege that the owner occupancy rates set forth in the
offering documents were overstated.

According to plaintiffs, whether a mortgaged property
is occupied by its owner is an important indicator of whether the
loan will be repaid (Compl. ¶¶ 85-86).  Plaintiffs allege that
studies show that mortgages on properties that are not occupied
by their owners are twice as likely to go into default than
properties that are owner occupied (Compl. ¶ 87).

Plaintiffs allege that they investigated 2,022 of the loans underlying the securitizations by looking at credit histories of the mortgagors.  Plaintiffs found that six months after the origination dates of the mortgages, a significant number of mortgagors listed mailing addresses that were different than that of the mortgaged property (Compl. ¶¶ 92-93).  Plaintiffs allege the specific results of their investigation are as follows:

| Trust | Represented Owner-Occupied Percentage (Pro. Supp.) | Percentage of Loans in Sample represented in Pro. Supp. to be Owner-Occupied | Percentage of Reported Owner-Occupied Loans Sampled Not on Mortgagor's Credit History After 6 Months | Percentage by which Owner-Occupancy was Overstated in Pro. Supp. Based on the Sample |
|---|---|---|---|---|
| ABFC 06-OPT1 | 92.39% (Pro. Supp. at A-8) | 93.8% | 24.0% | 22.5% |
| ABFC 06-OPT3 | 92.79% (Pro. Supp. at A-7) | 94.2% | 25.4% | 23.9% |
| CBASS 05-CB6 | 92.90% (Pro. Supp. at S-19) | 94.0% | 16.0% | 15.0% |
| CBASS 06-CB6 | 93.19% (Pro. Supp. at A-3) | 93.8% | 15.0% | 14.1% |
| CBASS 06-CB8 | 93.57% (Pro. Supp. at A-11-2) | 92.2% | 20.0% | 18.4% |
| MLMI 05-SL3 | 91.84% (Pro. Supp. at S-26) | N/A | N/A | N/A |
| SURF 05-AB2 | 88.70% (Pro. Supp. at S-31) | 88.2% | 9.7% | 8.6% |

(Compl. ¶ 95).  Without specifically identifying what information the due diligence reviews revealed with respect to owner occupancy rates, plaintiffs go on to claim that defendants knew that owner occupancy rates were being overstated as a result of their

due diligence investigation and Clayton's investigation (Compl. ¶¶ 94, 98, 107).[6]

The offering documents for all the securitizations expressly note that the information concerning owner occupancy was based on the representations of the borrowers at the times of origination.[7]   Plaintiffs do not allege that the owner occupancy

---

[6]Plaintiffs do not identify what documents defendants or Clayton could have seen in their due diligence review that would have disclosed that the reported owner occupancy rates were false.  Given plaintiffs' allegation, that the due diligence review is conducted by reviewing the loan files (Compl. ¶¶ 43-44), and that the loan files, presumably, close once the loan is made, it is difficult to deduce what documents in the loan files would have tipped off defendants or Clayton that a borrower's owner occupancy representation was false.  If an owner moved out of the mortgaged property after the loan closed, it is far from clear that there would be anything in the file reflecting that fact.

[7]For example, the offering documents for the ABFC 2006-OPT1 and ABFC 2006-OPT3 securitizations contained the following disclaimer:  "Occupancy Status of the Initial Mortgage Loans [is b]ased on a representation made by the borrower at the time of origination" (Choe Decl. Ex. 1 at A-8, Ex. 2 at A-7).

Similarly, the offering documents for the C-BASS 2005-CB6 securitization contained the following disclaimers:

The Mortgage Pool

Credit-Based Asset Servicing and Securitization LLC (the "Seller") provided the information in the following paragraphs.  None of the Depositor, the Underwriters, the Servicer, the Trustee or any of their respective affiliates has made or will make any representation as to the accuracy or completeness of such information.

(continued...)

28

rates set forth in the offering documents mis-state the borrow-
ers' representations.

In the absence of an allegation that defendants misrep-
resented the borrowers' statements, the complaint does not allege
that the owner occupancy representations are false.  The plain-
tiffs in Union Cent. Life Ins. Co. v. Credit Suisse Secs. (USA),
LLC, 11 Civ. 2327 (GBD), 2013 WL 1342529 (S.D.N.Y. Mar. 29, 2013)
(Daniels, D.J.) made identical allegations with respect to an
RMBS issuer's statements concerning owner occupancy.  The Honor-
able George B. Daniels, United States District Judge found the
allegations insufficient to allege falsity, stating:

> Plaintiffs have not sufficiently alleged any false
> statements with respect to owner occupancy ratios.  The
> Offering Materials state that the stated occupancy
> statuses were based solely on borrower's representation
> at origination . . . .  Plaintiffs do not allege that
> Defendants did not accurately report the information
> received by borrowers.  Because the Offering Materials
> explicitly stated that all occupancy rates were based
> only on borrowers' representations and because Plain-
> tiffs do not allege that Defendants falsely reported
> the borrowers' representations, Plaintiffs have alleged
> no misstatements concerning owner-occupancy rates.  See
> Footbridge, Ltd. v. Countrywide Home Loans, Inc., No.
> 09 Civ. 4050, 2010 WL 3790810, at * 9 (S.D.N.Y. Sept.
> 28, 2010) [(Castel, D.J.)]; Mass. Mut. Life Ins. Co. v.

---

[7](...continued)
    OCCUPANCY STATUS OF THE MORTGAGE POOL [is b]ased on a
    representation made by the borrower at the time of
    origination.

(Choe Decl. Ex. 3 at S-15 and S-19).

Res. Funding Co., LLC, 843 F. Supp. 2d 191, 205 (D. Mass. 2012).

2013 WL 1342529 at *9.[8]

Thus, I recommend that the complaint be dismissed to the extent that it alleges falsity with respect to the rate of owner occupancy.

### 4.   Failure to Transfer Notes and Mortgages to Trusts

Plaintiffs also allege that defendants misrepresented that the trust certificates were backed by residential mortgages.

As alleged in the complaint, the offering documents for each of the trusts represents that the trusts would consist of residential mortgage loans that either had been or would be transferred to the trusts.  The specific representations on which plaintiffs rely are as follows:

---

[8]Although Judge Stanton reached a different result on similar facts in F.D.I.C. v. Chase Mortgage Finance Corp., supra, 2013 WL 5434633 at *9, he expressly noted that the claims there were asserted under Section 11 of the Securities Act which imposes virtually absolute liability for inaccurate statements, even if made innocently.  See also Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 329-30 (S.D.N.Y. 2012) (Cote, D.J.) (reaching same result as Judge Stanton in case alleging claim under Section 11 of Securities Act).

| Trust | Representation |
|-------|----------------|
| ABFC 2006-OPT1 | "At the time of issuance of any Series of Securities, the Depositor will assign (or cause to be assigned) to the designated Trustee the Assets to be included in the related Trust Fund, together with all principal and interest to be received on or with respect to such Assets after the Cut-off Date, other than principal and interest due on or before the Cut-off Date and other than any Retained Interest.  The Trustee will, concurrently with such assignment, deliver the Securities to the Depositor in exchange for the Assets and the other assets comprising the Trust Fund for such Series.  Each Asset will be identified in a schedule appearing as an exhibit to the applicable Agreement."  Pro. Supp. dated August 8, 2006 at p. 48. |
| ABFC 2006-OPT3 | "At the time of issuance of any Series of Securities, the Depositor will assign (or cause to be assigned) to the designated Trustee the Assets to be included in the related Trust Fund, together with all principal and interest to be received on or with respect to such Assets after the Cut-off Date, other than principal and interest due on or before the Cut-off Date and other than any Retained Interest.  The Trustee will, concurrently with such assignment, deliver the Securities to the Depositor in exchange for the Assets and the other assets comprising the Trust Fund for such Series. Each Asset will be identified in a schedule appearing as an exhibit to the applicable Agreement."  Pro. Supp. dated November 13, 2006 at p. 50. |
| CBASS 2005-CB6 | "At the time of issuance of any series of Securities, the Depositor will assign (or cause to be assigned) to the designated Trustee the Assets to be included in the related Trust Fund, together with all principal and interest to be received on or with respect to such Assets after the Cut-off Date, other than principal and interest due on or before the Cut-off Date and other than any Retained Interest.  The Trustee will, concurrently with such assignment, deliver the Securities to the Depositor in exchange for the Assets and the other assets comprising the Trust Fund for such series. Each Asset will be identified in a schedule appearing as an exhibit to the related Agreement."  Pro. Supp. dated September 28, 2005 at p. 36-37. |
| CBASS 2006-CB6 | "At the time of issuance of any Series of Securities, the Depositor will assign (or cause to be assigned) to the designated Trustee the Assets to be included in the related Trust Fund, together with all principal and interest to be received on or with respect to such Assets after the Cut-off Date, other than principal and interest due on or before the Cut-off Date and other than any Retained Interest.  The Trustee will, concurrently with such assignment, deliver the Securities to the Depositor in exchange for the Assets and the other assets comprising the Trust Fund for such Series." Pro. Supp. dated July 27, 2006 at p. 48. |

CBASS 2006-CB8          "At the time of issuance of any series of Securities, the
                        Depositor will assign (or cause to be assigned) to the desig-
                        nated Trustee the Assets to be included in the related Trust
                        Fund, together with all principal and interest to be received
                        on or with respect to such Assets after the Cut-off Date,
                        other than principal and interest due on or before the
                        Cut-off Date and other than any Retained Interest.  The
                        Trustee will, concurrently with such assignment, deliver the
                        Securities to the Depositor in exchange for the Assets and
                        the other assets comprising the Trust Fund for such series.
                        Each Asset will be identified in a schedule appearing as an
                        exhibit to the related Agreement.  Such schedule will include
                        detailed information in respect of each Loan included in the
                        related Trust Fund."  Pro. Supp. dated October 26, 2006 at p.
                        32.

MLMI 2005-SL3           "At the time of issuance of any series of Securities, the
                        Depositor will assign (or cause to be assigned) to the desig-
                        nated Trustee the Assets to be included in the related Trust
                        Fund, together with all principal and interest to be received
                        on or with respect to such Assets after the Cut-off Date,
                        other than principal and interest due on or before the
                        Cut-off Date and other than any Retained Interest.  The
                        Trustee will, concurrently with such assignment, deliver the
                        Securities to the Depositor in exchange for the Assets and
                        the other assets comprising the Trust Fund for such
                        series.  Each Asset will be identified in a schedule appear-
                        ing as an exhibit to the related Agreement."  Pro. Supp.
                        dated November 8, 2005 at p. 36-37.

SURF 2005-AB2           "At the time of issuance of any series of Securities, the
                        Depositor will assign (or cause to be assigned) to the desig-
                        nated Trustee the Assets to be included in the related Trust
                        Fund, together with all principal and interest to be received
                        on or with respect to such Assets after the Cut-off Date,
                        other than principal and interest due on or before the
                        Cut-off Date and other than any Retained Interest. The
                        Trustee will, concurrently with such assignment, deliver the
                        Securities to the Depositor in exchange for the Assets and
                        the other assets comprising the Trust Fund for such series.
                        Each Asset will be identified in a schedule appearing as an
                        exhibit to the related Agreement." Prospectus Supplement
                        dated September 13, 2005 at p. 36-37.

(Compl. App'x A at 5-6).  Plaintiffs go on to allege that after

their purchases, they conducted two investigations of the under-

lying mortgages by researching the recordings of mortgages,

assignments and satisfactions in the counties in which the

properties were located and found a number of instances in which

satisfactions were issued by an entity other than the trust,

suggesting that the mortgage was never transferred.  Plaintiffs also allege that they found other instances in which a transfer was recorded substantially later than the trust closing date. Specifically, in the first investigation, plaintiffs allege that they found 16 instances in which a satisfaction was issued by a party other than the trust that was represented as owning the loan and mortgage (Compl. ¶ 168).  Plaintiffs also claim that they found 33 instances in which a mortgage was assigned to the trust after the trust's closing date (Compl. ¶ 169).

In the course of plaintiffs' second investigation, they analyzed 1,113 mortgages that were part of the securitizations. This investigation focused solely on recorded assignments and disclosed the following:

| Trust | Sample Size | Percentage of Sample Evidencing Assignments to the Trusts at Issuance | Percentage of Sampled Mortgages Assigned to a Party other than the Trust |
|---|---|---|---|
| ABFC 06-OPT1 | 139 | 0% | 28.1% |
| ABFC 06-OPT3 | 175 | 0.6% | 33.7% |
| CBASS 05-CB6 | 124 | 0% | 34.7% |
| CBASS 06-CB6 | 264 | 0% | 24.6% |
| CBASS 06-CB8 | 253 | 0% | 16.2% |
| MLMI 05-SL3 | N/A | N/A | N/A |

SURF 05-AB2              158              0%              53.2%

(Compl. ¶ 182).

   Defendants argue, among other things, that the forego-
ing allegations are insufficient to allege falsity because they
allege, at most, a promise that an event will occur in the
future, i.e., the transfer of the mortgages to the trust, and,
according to defendants, in the absence of an allegation that
there was no intention to perform this promise at the time it was
made, a claim for fraud does not lie (Defs. Mem. at 18).  Plain-
tiffs counter by claiming that the offering documents contain
multiple representations that the certificates being offered were
backed by residential mortgages (Compl. ¶ 174 & App'x A thereto
at 4).

   "In evaluating alleged misrepresentations or omissions,
the Court must read and consider the offering documents in their
entirety." Johnson v. Sequans Commc'ns S.A., 11 Civ. 6341 (PAC),
2013 WL 214297 at *8 (S.D.N.Y. Jan. 17, 2013) (Crotty, D.J.),
citing In re Morgan Stanley, 592 F.3d 347, 365-66 (2d Cir. 2010)
and Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d
Cir. 1996).  When read in their entirety (or, at least, reading
the entirety of the excerpts submitted by the parties), I con-
clude that the offering documents represent that the trusts will
be mortgage backed after the closing and after the mortgages are

34

assigned to the trusts.  The offering documents do not represent that the trusts own the mortgages prior to that time.  For example, the prospectus supplement to the ABFC 2006-OPT1 Trust states on page 1, **"The Assets of the Issuing Entity Will Include** - [t]hree groups of first and second lien residential mortgage loans" (Choe Decl. Ex. 1 at 1).  Similarly, the prospectus supplement for MLMI 05-SL3 Trust states "The trust will consist primarily of sub-prime mortgage loans secured by second liens on real properties . . ." (Choe Decl. Ex. 6 at 1).  The use of the future tense, in conjunction the language quoted at pages 31-32, above, demonstrates that the transfer of the mortgages will occur prospectively.

Because the transfer of the mortgages is described as a prospective event, I find that the representations made in connection with each of the trusts that the depositor will assign the mortgages to the trust is, at best, a promise that an event will occur in the future.  The case law discussing when a fraud claim can be predicated on a broken promise or a misrepresenta-tion of the promisor's intent to perform remains in somewhat of a murky state.  Compare Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994) ("The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made.") with

35

MBIA Ins. Corp. v. Countrywide Home Loans, Inc., 87 A.D.3d 287, 293, 928 N.Y.S.2d 229, 233 (1st Dep't 2011) ("General allegations that a defendant entered into a contract with the intent not to perform are insufficient to support a fraud claim.").  The clearest statement of the law is probably that set forth in Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996):  "To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages" (internal citations omitted).  Accord TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 91 (2d Cir. 2005).  To constitute "a fraudulent misrepresentation collateral or extrane-ous to the contract," the statement must be "a misrepresentation regarding present facts, as opposed to one reflecting an intent to perform in the future, [and must be] collateral to the con-tract." Solutia Inc. v. FMC Corp., 385 F. Supp. 2d 324, 342 (S.D.N.Y. 2005) (Pauley, D.J.), citing Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003, 1004 (1986).

Judged by these standards, plaintiffs have alleged, at most, a breach of contract. The representations concerning the transfers of the mortgages are central to the sale of the certificates; without the mortgages, the trusts are empty shells with no source of income. The close relationship between the transfer of the mortgages and the sale of the certificates precludes the purported misrepresentations concerning the assignment of the mortgages from being the predicate of a fraud action.

In addition, even if I were to take a more permissive view of the law and assume that a fraud claim can be stated through the expedient of alleging that a defendant made a contractual promise that it never intended to perform, the complaint still fails because it does not allege that there was no intention to transfer the mortgages to the trusts at the time the offering documents were issued.

Thus, to the extent the complaint alleges fraud based on the failure to transfer the mortgages to the trusts, it fails to allege an actionable misrepresentation of an existing fact.

5.  Abandonment of
    Underwriting Guidelines

The complaint alleges that the offering documents misrepresented that the originators had followed underwriting

guidelines when they agreed to make the loans secured by the mortgages, when in fact, the originators had abandoned their underwriting guidelines.

Plaintiffs claim that the offering documents for all of the trusts represent that the loans that were being included in the trust either conformed to underwriting guidelines of the originator or possessed compensating factors (Compl. ¶ 140 & App'x A thereto at 2-3).[9]  Plaintiffs go on to allege that, in fact, a large number of loans did not conform to the originators' underwriting guidelines and did not possess any compensating characteristics; plaintiffs allege that this is demonstrated not only by the large number of loans with high LTV ratios and the high number of residences that were not owner occupied, but by other evidence as well (Compl. ¶ 141).  The complaint then discusses five of the originators of the loans that were included in the securitizations in issue -- Ameriquest Mortgage Company ("Ameriquest"), Fremont Investment & Loan ("Fremont"), New Century Mortgage Corporation ("New Century"), Option One Mortgage

---

[9]The offering documents for some of the trusts state that all loans complied with the originator's underwriting guidelines or had compensating factors, while others state that substantially all complied with the originator's underwriting guidelines or had compensating factors, and at least one states that the loans were generally in accordance with underwriting guidelines (see Compl. App'x A at 3).

Corporation ("Option One") and Ownit Mortgage Solutions, Inc.
("Ownit") -- and notes that each was identified by the Office of
the Comptroller of the Currency as being among the ten worst
mortgage originators in the worst ten metropolitan areas based on
the number of mortgage foreclosures[10] (Compl. ¶ 143).  According
to the complaint, these five entities originated loans that were
included in the following trusts:

| | |
|---|---|
| Ameriquest | CBASS 2006-CB6 |
| | CBASS 2006-CB8 |
| Fremont | SURF 2005-AB2 |
| New Century | CBASS 2006-CB6 |
| Option One | ABFC 2006-OPT1 |
| | ABFC 2006-OPT3 |
| Ownit | CBASS 2006-CB6 |
| | CBASS 2006-CB8 |

(Compl. ¶¶ 144, 148, 154, 161, 165).

        The complaint them goes on to discuss adverse findings
made in various government reports with respect to each of these
originators and the nature of some of the allegations that have
been made against them in other litigations (Compl. ¶¶ 144-66).
For example, the complaint alleges that Ameriquest was the
subject of a multistate investigation for various types of

_____

        [10]The complaint alleges that the report was originally
issued in 2008 and was supplemented and updated once in 2009 and
twice in 2010 (Compl. ¶ 143).

misconduct including predatory lending, inflating home apprais-
als, unilaterally converting fixed-rate mortgages to adjustable
rate mortgages and improperly raising interest rates; according
to the complaint, this investigation resulted in a $325 million
settlement (Compl. ¶ 145).  The complaint also alleges that the
head of Ameriquest's Mortgage Fraud Investigations Department
admitted to the Federal Crisis Inquiry Commission that he had
reported various fraudulent practices to management as early as
2003, but management ignored his reports and ultimately laid him
off in 2006 (Compl. ¶ 146).  Finally, the complaint alleges that
another purchaser of loans originated by Ameriquest has commenced
an action against Ameriquest to compel it to repurchase non-
performing loans that did not comply with Ameriquest's underwrit-
ing guidelines (Compl. ¶ 147).  Apart from the LTV ratios, CLTV
ratios and owner-occupancy issues discussed above, the complaint
does not identify any specific departures from underwriting
guidelines by any of the originators with respect to the loans
included in the securitizations in issue.

          Defendants contend that the foregoing allegations are
insufficient for several reasons.  Defendants first contend that
plaintiffs have not alleged any facts suggesting a departure from
underwriting guidelines with respect to the loans that comprise
the securitization at issue in this action (Defs.' Mem. at 19-

40

22).  Defendants' argument is persuasive.  As set forth above, plaintiffs' allegations in support of their theory of the whole-sale abandonment of the underwriting guidelines consist entirely of descriptions of unrelated wrongdoing by the five entities who originated loans that made up five of the seven securitizations in issue.[11]  In addition, some of the misconduct alleged by these originators, such as unilaterally converting fixed-rate mortgages to adjustable rate mortgages and unilaterally raising interest rates, bears no relationship to the misconduct alleged here, i.e., making high-risk loans.  To the extent relevant misconduct is alleged, it is not alleged with respect to any of the loans in issue here.

Without identification of the specific facts that allegedly put defendants on notice that the originators' repre-sentations concerning their adherence to underwriting guidelines was false, plaintiffs' allegations are insufficient to allege fraud.  In Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., 821 F. Supp. 2d 616 (S.D.N.Y. 2011), the Honorable William H. Pauley, III, United States District Judge, rejected remarkably

---

[11]Plaintiffs offer no factual allegations with respect to the originators of the loans that comprised the CBASS 2005-CB6 and MLMI 2005-SL3 securitizations.

similar allegations in a common law fraud action arising out of
plaintiffs' purchase of certificates in an RMBS trust:

> Landesbank alleges that Goldman learned of the
> poor quality of the mortgages underlying the mort-
> gage-backed securities before the Davis Square offer-
> ing.  More specifically, the Complaint asserts that
> Goldman knew that Countrywide, New Century, and Fremont
> had abandoned their publicly stated guidelines and that
> their mortgages had higher than industry-average de-
> fault rates.  Thus, Landesbank asserts, Goldman knew
> that the following statements in the offering material
> were false:  (1) Davis Square earned a valid triple-A
> rating, (2) Davis Square was a "High Grade Structured
> Product CDO," and (3) the information contained in the
> Circular was "in accordance with the facts and did not
> omit anything likely to affect the import of such
> information."

> Under the heightened pleading requirements of Rule
> 9(b), it is well settled that "[w]here plaintiffs
> contend defendants had access to contrary facts, they
> must specifically identify the reports or statements
> containing this information." Novak v. Kasaks, 216
> F.3d 300, 309 (2d Cir. 2000).  An "unsupported general
> claim of the existence of confidential company . . .
> reports that revealed [contrary information] is insuf-
> ficient to survive a motion to dismiss." San Leandro
> Emergency Med. Group Profit Sharing Plan v. Philip
> Morris Cos., 75 F.3d 801, 812 (2d Cir. 1996).  To move
> past the pleading stage, plaintiff must "specify the
> internal reports, who prepared them and when, how firm
> the numbers were or which company officers reviewed
> them." In re Scholastic Corp. Sec. Litig., 252 F.3d
> 63, 72 (2d Cir. 2001); see also  Plumbers &
> Steamfitters Local 773 Pension Fund v. Canadian Impe-
> rial Bank of Commerce, 694 F. Supp .2d 287, 300
> (S.D.N.Y. 2010) (dismissing action where "Plaintiff
> ha[d] not specifically identified any reports or state-
> ments or any dates or time frame in which Defendants
> were put on notice of contradictory information.");

> Xerion Partners I LLC v. Resurgence Asset Mgmt., LLC,
> 474 F. Supp. 2d 505, 518 (S.D.N.Y. 2007) (same).

821 F. Supp. 2d at 621-22.

The Court of Appeals subsequently affirmed on this

precise issue, stating:

> The complaint alleges that Goldman had access to confi-
> dential due diligence reports which showed that the
> quality of the mortgages underlying the collateral for
> the Davis Square notes did not justify the notes'
> triple—A ratings.  However, an allegation that defen-
> dants had access to information that was inconsistent
> with their alleged misstatements "must specifically
> identify the reports or statements containing this
> information." Novak, 216 F.3d at 309; see also San
> Leandro Emergency Med. Grp. Profit Sharing Plan v.
> Philip Morris Cos., 75 F.3d 801, 812–13 (2d Cir. 1996).
> The only due diligence report specifically identified
> in the complaint is dated from 2007, after the issuance
> of the Davis Square notes, and the due diligence con-
> veyed in that report therefore does not bear on the
> defendants' knowledge at the time of issuance.  The
> generalized references in the complaint to other due
> diligence reports commissioned by Goldman are insuffi-
> cient to sustain Landesbank's pleading burden as to
> intent.

Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., supra, 478

F. App'x at 681-82.

In an effort to buttress their allegations, plaintiffs

argue that their fraud claim is viable because defendants them-

selves knew the originators had disregarded their own underwrit-

ing guidelines.  The only alleged facts plaintiffs offer in

support of this contention are their allegations that defendants

permitted a substantial number of non-conforming loans to be

included in the securitizations despite warning from their due

diligence consultant, Clayton.  Specifically, plaintiffs allege:

98.   For example, during the period from 2006 through mid-2007, Clayton reviewed the loan files for more than 10,000 loans for BOA and more than 55,000 loans for Merrill Lynch.  See All Clayton Trending Reports, 1st Quarter 2006 – 2nd Quarter 2007.  The purpose of Clayton's review was to determine whether the loans complied with the underwriting guidelines of the originator.  This review scrutinized many aspects of the originators' guidelines, including LTV and CLTV ratios and owner-occupancy rates.

99.   Clayton scored each loan it reviewed on a scale of 1 to 3.  A score of "1" meant that the loan complied with the underwriting guidelines of the originator.  A score of "2" meant that the loan did not comply with the originator's underwriting guidelines, but had unspecified "compensating factors."  A score of "3" meant that the loan did not comply with the originator's underwriting guidelines and did not possess any compensating factors.

100.   During the period from 2006 through mid-2007, approximately 30% of the loan files Clayton reviewed for BOA and approximately 23% of the loan files Clayton reviewed for Merrill Lynch received a failing score of 3.  Clayton provided detailed reports to Defendants containing the scores of the reviewed loans prior to and during the preparation of the Offering Documents.  It would be reckless, or in the alternative, negligent, for Defendants to fail to assume that a similar percentage of the unsampled loans were subject to similar deficiencies.  It also would be reckless, or in the alternative, negligent, for Defendants to fail to recognize that there were systemic deficiencies in the origination process upon which they were relying, which Defendants failed to disclose in the Offering Documents.

101.   The BOA and Merrill Lynch Defendants therefore knew when they were preparing the Offering Documents for the Securitizations that, on average, approx-

imately 30% of the loans reviewed for BOA and approxi-
mately 23% of the loans reviewed for Merrill Lynch
failed to comply with the underwriting guidelines of
the originator and were without any compensating fac-
tors.

102.   Despite having the results of Clayton's
review, BOA "waived in" 27.4% of the loans Clayton had
reviewed and rejected as non-conforming with underwrit-
ing guidelines and without compensating factors and
Merrill Lynch "waived in" 31.8% of such loans.   The BOA
and Merrill Lynch Defendants ultimately included those
loans in the pools purportedly underlying the RMBS sold
to investors, including Plaintiffs. That means BOA and
Merrill Lynch knew (whereas Plaintiffs did not) and
failed to disclose that a significant percentage of the
loans purportedly included in their RMBS were unaccept-
able by the originators' own standards.

(Compl. ¶¶ 98-102).

However, when closely examined, the percentages set

forth in the foregoing allegations actually contradict the

inference of a wholesale abandonment of underwriting guidelines.

First, Clayton's review does not suggest abandonment of under-

writing guidelines.  With respect to the BOA securitizations,

Clayton found that more than two out of three loans to be either

in conformity with underwriting guidelines or to possess adequate

compensating factors.  With respect to the Merrill Lynch

securitizations, more than three out of four loans were found to

be either in conformity with underwriting guidelines or to

possess adequate compensating factors.  Although these statistics

might suggest that the originators took a more permissive view of

45

what loans could be included than Clayton did, they do not fairly imply an abandonment of underwriting guidelines.

In addition, plaintiffs' own allegations admit that defendants and Clayton disagreed as to the inclusion of less than 10% of the loans reviewed by Clayton and that defendants concurred with Clayton with respect to the vast majority of deficient loans.  Plaintiff alleges that Clayton found 30% of the 10,000 loans it examined for BOA (or 3,000 loans) to be non-conforming and without compensating factors.  BOA is alleged to have waived in 27.4% of those 3,000 loans or 822 loans (8.2% of the loans reviewed by Clayton) (Compl. ¶¶ 98-102).  Thus, of the 10,000 loans Clayton sampled, BOA and Clayton had a disagreement as to the inclusion of 8.2% of the loans, and agreement as to whether 91.8% of the loans should or should not be included in the securitizations.

Plaintiffs' allegations with respect to Merrill Lynch yield the same results.  Clayton reviewed 55,000 loans for Merrill Lynch and found 23% of these 55,000 loans (or 12,650 loans) to be non-conforming and to lack compensating factors (Compl. ¶ 100).  Plaintiffs allege that Merrill Lynch waived in 31.8% of the 12,650 loans or 4,023 loans (7.314% of the loans reviewed by Clayton) (Compl. ¶ 102).  Thus, of the 55,000 loans Clayton sampled for Merrill Lynch, Merrill Lynch and Clayton had

a disagreement as to the inclusion of approximately 7.3% of the loans, and agreement as to the inclusion or exclusion of approximately 92.7% of the loans.  Again, the numbers simply do not come close to demonstrating that Merrill Lynch sanctioned the widespread abandonment of underwriting guidelines.

The complaint also alleges that an individual employed by a second entity retained by Merrill Lynch to review loans, The Bohan Group, Inc., has stated that the

> "pressure [from Merrill Lynch] was so intense to ap-
> prove as many loans as quickly as possible" that a
> supervisor would stand on a desk screaming at the loan
> reviewers . . . . The same loan reviewer, referring to
> the fraudulent approval and securitization of non-com-
> pliant loans, singled out Merrill Lynch as having
> "perpetuated the whole thing" and stated that if she
> identified a loan as non-conforming with the applicable
> underwriting guidelines, "a Merrill supervisor would
> find a way to get the loan approved."

(Compl. ¶ 115).  The complaint does not, however, allege any connection between the comments from the Bohan employee and the specific loans that made up the securitizations in issue here.

The foregoing allegations are insufficient to salvage plaintiffs' allegations that the defendants' representations concerning adherence to underwriting guidelines were false.  The allegation concerning Clayton's review of the loan files demon-strates that defendants and Clayton concurred on the inclusion or exclusion of more than 90% of the loans reviewed by Clayton and

47

that the number of non-conforming loans that were waived-in was quite small.  And to the extent the complaint invites the reader to infer that the originators departed from their underwriting guidelines based on their alleged misconduct in other cases, numerous courts have concluded that such allegations are insufficient where the complaint asserts a fraud claim subject to Rule 9(b)'s particularity requirement.  Republic Bank & Trust Co. v. Bear Stearns & Co., Inc., supra, 683 F.3d at 256-57; Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. Morgan Stanley & Co., 814 F. Supp. 2d 344, 352 (S.D.N.Y. 2011) (Jones, D.J.); Tsereteli v. Residential Asset Securitization Trust 2006-A8, supra, 692 F. Supp. 2d at 394; Footbridge Ltd. v.  Countrywide Home Loans, Inc., supra, 2010 WL 3790810 at *12-*13.[12]

---

[12]To the extent plaintiffs cite cases reaching the opposite result on similar facts, those cases appear to be cases brought under Section 11 of the Securities Act, 15 U.S.C. § 77k, which are not subject to the more stringent pleading requirements of Rule 9(b) unless they sound in fraud.  In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 760-61, 767-68 (S.D.N.Y. 2012) (Swain, D.J.); In re IAC/InterActiveCorp Secs. Litig., 695 F. Supp. 2d 109, 116 (S.D.N.Y. 2010) (Holwell, D.J.), citing In re Refco, Inc. Secs. Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (Lynch, D.J.).  Additional cases cited by plaintiffs that fall into this category include New Jersey Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F. Supp. 2d 254, 262 n.6 (S.D.N.Y. 2010) (Baer, D.J.)(expressly noting that Rule 9(b)'s particularity requirement did not apply to the case); In re Indy Mac Mortg. Backed Secs. Litig., supra, 718 F. Supp. 2d 495; Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co., 814 F. Supp. 2d 141, 152

(continued...)

Where allegations of abandonment of underwriting guidelines have been found sufficient, the plaintiffs offered far more detail than plaintiffs offer here.  For example, in Fed. Hous. Fin. Agency v. JPMorgan Chase & Co., supra, 902 F. Supp. 2d 476, plaintiffs alleged that (1) principals of the issuers had made admissions concerning the poor quality of the loan origina- tions underlying the issuers' RMBS; (2) a widespread downgrade in the ratings of the trust certificates in issue; (3) as many as 60% of the safest loans in each securitization were in default; (4) plaintiffs had performed a forensic review on loan files drawn from three of the securitizations in issue and found that more than 79% of the loans reviewed in each securitization neither complied with the originator's underwriting guidelines nor had compensating factors.  902 F. Supp. 2d at 486-87.  The complaint here lacks comparable allegations.

Finally, plaintiffs' claims concerning defendants' putative abandonment of underwriting guidelines also fail because defendants did not independently represent that the loans com- plied with the originators' underwriting guidelines; rather, they merely repeated the representations of the originators concerning

---

[12](...continued)
(S.D.N.Y. 2011) (Koeltl, D.J.) (noting that in the absence of an allegation of fraud, Rule 9(b) does not apply to a Section 11 action).

compliance with underwriting guidelines (Defs.' Mem. App'x D at 19-20).  In the absence of an allegation of specific facts suggesting defendants' knowledge that the originators' representations were untrue, these allegations are insufficient to allege a misrepresentation.  See VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP, 348 F. Supp. 2d 255, 271 (S.D.N.Y.  2004) (Kaplan, D.J.).

6.  Scienter

Defendants next allege that the complaint fails to allege scienter adequately.[13]

The complaint's principal allegations of scienter are that defendants knew or should have known of the alleged misrepresentations in their offering documents as a result of their own

---

[13]A threshold issue which the parties do not address is whether the plaintiffs are required to allege facts that give rise to a "strong inference" of fraud with respect to their common law fraud claim.  Although the Private Securities Litigation Reform Act's ("PSLRA's") requirement that the complaint allege facts that give rise to a "strong inference" of fraud, 15 U.S.C. § 78u-4(b)(1), does not apply here because all of plaintiffs' claims are common law claims, the Court of Appeals had applied the identical requirement to fraud claims even prior to the enactment of the PSLRA.  Stephenson v. PricewaterhouseCoopers, LLP, 482 F. App'x 618, 622 n.5 (2d Cir. 2012), citing Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990); see also Fed. Hous. Fin. Agency v. JPMorgan Chase & Co., supra, 902 F. Supp. 2d at 491.  Accordingly, I shall apply the "strong inference" standard by virtue of the Second Circuit's pre-PSLRA precedent.

due diligence review and the due diligence review of their
consultant, Clayton (Compl. ¶¶ 9, 12, 14, 20, 23, 42, 44, 61, 64,
72, 83, 84, 96, 97, 104, 107, 112, 114, 115, 153).  The complaint
also alleges that the defendants that provided warehouse credit
facilities would have had enhanced access to the originators who
received such financing and would have known the details of the
loans those originators were making (Compl. ¶¶ 14, 42, 112, 119-
22).  Beyond alleging that defendants either did or should have
discovered the falsity of the representations which plaintiffs
now claim were false, the complaint does not identify the spe-
cific information that either did or should have came to light
during the due diligence review.

> To allege scienter adequately,

> a complaint must state with particularity facts giving
> rise to a strong inference that the defendant acted
> with the requisite state of mind.  The requisite state
> of mind is an intent to deceive, manipulate, or de-
> fraud.  Sufficient allegations of recklessness -- an
> extreme departure from the standards of ordinary care,
> and which presents a danger of misleading buyers or
> sellers that is either known to the defendant or is so
> obvious that the actor must have been aware of it --
> satisfy the scienter requirement.

> In evaluating whether a complaint sufficiently
> pleads a strong inference of scienter, courts must
> consider all the facts alleged, inferences favoring
> plaintiffs rationally drawn from the facts, as well as
> plausible, nonculpable explanations for the defendant's
> conduct.  A complaint will survive a motion to dismiss
> only if a reasonable person would deem the inference of
> scienter cogent and at least as compelling as any

opposing inference one could draw from the facts al-
leged.

In re Lehman Bros. Secs. & ERISA Litig., 903 F. Supp. 2d 152,
169-170 (S.D.N.Y. 2012) (Kaplan, D.J.) (inner quotations and
footnotes omitted); accord Union Cent. Life Ins. Co. v.
Credit Suisse Secs. (USA), LLC, supra, 2013 WL 1342529 at *4; Pa.
Pub. Sch. Emps.' Ret. Sys. v. Bank of Am., Corp., 874 F. Supp. 2d
341, 357 (S.D.N.Y. 2012) (Pauley, D.J.).  General allegations
that a defendant engaged in misconduct in order to maximize its
profits do not adequately allege scienter.  Novak v. Kasaks,
supra, 216 F.3d 300 at 307.

Where, as here, the alleged misrepresentations origi-
nated with parties other than the defendants and plaintiffs'
theory is that defendants repeated the third parties' statements
knowing them to be untrue, the complaint must identify the
specific information that came to defendants' attention and
demonstrated the falsity of the statements in issue.  As noted
above, "[a]n allegation that defendants had access to information
that was inconsistent with their alleged misstatements must
specifically identify the reports or statements containing this
information." Landesbank Baden-Wurttemberg v. Goldman, Sachs &
Co., supra, 478 F. App'x at 682 (inner quotation marks and
citation omitted); accord San Leandro Emergency Med. Grp. Profit

52

Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 812 (2d Cir.
1996) (An "unsupported general claim of the existence of confi-
dential company . . . reports that revealed [contrary informa-
tion] is insufficient to survive a motion to dismiss."); Union
Cent. Life Ins. Co. v. Credit Suisse Secs. (USA), LLC, supra,
2013 WL 1342529 at *7; Fed. Hous. Fin. Agency v. JPMorgan Chase &
Co., supra, 902 F. Supp. 2d at 493; Deutsche Zentral-
Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc., supra, 2013
WL 6667601 at *19.

        The complaint does not identify any specific informa-
tion that came to defendants' attention and that put defendants
on notice that the third-party statement they were re-transmit-
ting were false.  Accordingly, the complaint should also be
dismissed because it fails to allege scienter adequately.

        7.  Reliance

        Defendants argue that the complaint's allegation of
reliance is defective in two respects.  First, the trade dates
alleged by plaintiffs precede the effective dates of the prospec-
tus supplements which are alleged to contain the misrepresenta-
tions.  Second, defendants claim that plaintiffs did not exercise
sufficient due diligence themselves before purchasing the certif-
icates and, therefore, their alleged reliance was not reasonable.

                           53

Defendants' first argument is persuasive, their second is not.  Defendants are correct that the trade dates alleged by plaintiffs all precede the dates of the respective prospectus supplements which are alleged to contain the misrepresentations in issue (compare Compl. ¶ 39 with Choe Decl. Exs. 1-7, all at page 1).  The complaint does not allege that the information in the prospective supplements was conveyed to them prior to the issuance of the prospective supplements, and one cannot take action on reliance on representations that are not made until after the action is taken.

Plaintiffs offer two responses to defendants' argument. First they argue that the complaint defines the "offering documents" as including all documents that were distributed to investors before the final prospectus supplements were issued, such as registration statements, prospectuses, free writing prospectuses, untitled collateral reports and terms sheets (Plaintiffs' Mem. at 29; see Compl. ¶ 2).  Plaintiffs' description of the complaint is accurate, but it overlooks the fact that the only misrepresentations that plaintiffs identify with particularity are those set forth in the prospectus supplements.

Second, plaintiffs claim that defendants' reliance argument "has been rejected by numerous courts," (Plaintiffs' Mem. at 29).  Plaintiffs, however, cite only one case for this

54

proposition, and that case is distinguishable on its facts.  In
Fed. Hous. Fin. Agency v. Deutsche Bank AG, 903 F. Supp. 2d 285,
289 (S.D.N.Y. 2012), the Honorable Denise L. Cote, United States
District Judge, did reject a similar argument as "meritless."
However, in that case, the complaint alleged that the misleading
statements were contained in documents that were distributed to
investors before they made their purchases and that those same
statements were subsequently incorporated into the prospectus
supplements.  903 F. Supp. 2d at 288-89.  Thus, in Deutsche Bank
AG, the documents containing the allegedly misleading statements
were alleged to be in the investors' hands before they made their
purchases.  No similar allegation is made here.

         Defendants' second argument -- that plaintiffs failed
to exercise sufficient diligence themselves before making their
purchases -- is unconvincing, at least at this stage of the
action.  The argument is in the nature of a contributory fault
defense that goes beyond the face of the complaint.  The com-
plaint does allege that plaintiff IKB SA hired two consultants to
review the purchase of the certificates before it made its
purchase decision (Compl. ¶¶ 192-99).  But, there is nothing in
the complaint's description of this review that allows me to
conclude as a matter of law that it was unreasonable, nor do
defendants admit that they offered securities of such obviously

atrocious quality that no reasonable investor would buy them.
Thus, defendants' second reliance argument requires the determi-
nation  of factual issues that cannot be addressed on a motion to
dismiss.  See NECA-IBEW Health & Welfare Fund v. Goldman Sachs &
Co., 693 F.3d 145, 157 n.8 (2d Cir. 2012) (because defendants
bear the burden of proving plaintiff's lack of due diligence and
reasonable care with respect to claims asserted under Sections 11
and 12 of the Securities Act, the issue cannot be resolved on a
Rule 12(b)(6) motion); In re Morgan Stanley Info. Fund Secs.
Litig., 592 F.3d 347, 359 n.7 (2d Cir. 2010) (same).

        Thus, the complaint should also be dismissed on the
ground that it fails to allege reasonable reliance adequately.

        8.  Loss Causation

        Defendants next argue that the complaint fails to
adequately allege loss causation.

        The complaint alleges that, as a result of defendants'
overstatement of the quality of the loans, plaintiffs paid more
for their certificates than they were actually worth and that
once "the true value of the credit risk materialized, the value
of the Certificates declined" (Compl. ¶ 200).  Plaintiffs allege
generally that the certificates received investment-grade ratings
as a result of defendants' overstatement of the quality of the

56

loans that comprised the trusts and that they were subsequently
downgraded to "junk" status (Compl. ¶ 200).  They further allege
that default rates with respect to the loans have "skyrocketed,"
that the trusts have lost substantial value as a result of the
defaults and that foreclosures have been difficult and expensive
as a result of issues concerning the ownership of the loans
(Compl. ¶ 200).  The complaint goes on to state:

> All of this is a direct result of the poor quality of
> the underlying loans and the failure to transfer the
> notes and mortgages to the Trusts, which was concealed
> from investors through the misrepresentations in the
> Offering Documents.  The circumstances that Defendants
> misrepresented and/or failed to disclose impaired cash
> flow and thus caused a decline in the market value of
> the Certificates from the inflated purchase prices paid
> by Plaintiffs, causing damages to Plaintiffs in an
> amount to be determined at trial.

(Compl. ¶ 200).

Pleadings similar to plaintiffs' were found adequate to
allege loss causation in a recent matter involving closely
analogous facts.

> To prove loss causation, [a plaintiff] must plead
> facts that indicate that the information concealed by
> the defendants' misrepresentations was "the reason the
> transaction turned out to be a losing one."  First
> Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769
> (2d Cir. 1994).  Furthermore, when a "plaintiff's loss
> coincides with a marketwide phenomenon causing compara-
> ble losses to other investors," a plaintiff must allege
> specific facts "which, if proven, would show that its
> loss was caused by the alleged misstatements as opposed
> to intervening events."  Lentell v. Merrill Lynch &

Co., 396 F.3d 161, 174 (2d Cir. 2005) (quoting First
Nationwide Bank, 27 F.3d at 772).

> However, the Court finds that [plaintiff] has
> sufficiently alleged that defendants' misrepresenta-
> tions hid facts that caused the ultimate economic
> harm the plaintiffs suffered.  [Plaintiff]  alleges that the
> securities performed poorly because of defaults on the
> underlying loans, against which the application of
> underwriting standards is intended to protect . . . .
> Moreover, as another Court in this district has found,
> Lentell does not place upon plaintiffs "the heavy
> burden of pleading facts sufficient to exclude other
> non-fraud explanations." King Cnty., Wash. v. IKB
> Deutsche Industriebank AG, 708 F. Supp. 2d 334, 342
> (S.D.N.Y. 2010).  Thus, because [plaintiff] plausibly
> alleges that defendants' conduct caused its losses on
> the securitizations, the Court finds that [plaintiff]
> has satisfied its burden of adequately pleading loss
> causation.

Dexia SA/NV v. Bear, Stearns & Co., 929 F. Supp. 2d 231, 243-44

(S.D.N.Y. 2013) (Rakoff, D.J.).

> Based on Dexia, I find that plaintiffs have adequately

alleged loss causation.


### 9.   Negligent Misrepresentation and Fraudulent Concealment

> As an alternative to their fraud claims, plaintiffs

also allege claims for negligent misrepresentation and fraudulent

concealment and arising out of the same facts alleged in support

of their fraud claim.

> "[T]he elements of negligent misrepresentation are:
> (1)carelessness in imparting words; (2) upon which
> others were expected to rely; (3) and upon which they

58

did act or failed to act; (4) to their damage.  Most
relevant, the action requires that (5) the declarant
must express the words directly, with knowledge or
notice that they will be acted upon, to one to whom the
declarant is bound by some relation or duty of care.
Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775,
788 (2d Cir. 2003) (citation omitted). "[T]he law of
negligent misrepresentation requires a closer degree of
trust between the parties than that of the ordinary
buyer and seller in order to find reliance on such
statements justified."  Id.

Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., supra, 478

F. App'x at 682; accord Jones v. City of New York, 12-CV-1739,

2013 WL 6814796 at *11 (E.D.N.Y. Dec. 20, 2013); Williamson v.

Stryker Corp., 12 Civ. 7083 (CM), 2013 WL 3833081 at *11

(S.D.N.Y. July 23, 2013) (McMahon, D.J.).  A buyer and seller of

securities are not in a special relationship that will support a

claim for negligent misrepresentation.  AHW Inv. P'ship v.

Citigroup Inc., 09 MD 2070 (SHS), 10 Civ. 9646 (SHS), 2013 WL

5827643 at *11 (S.D.N.Y. Oct. 30, 2013) (Stein, D.J.); Int'l Fund

Mgmt. S.A. v. Citigroup Inc., 822 F. Supp. 2d 368, 388 (S.D.N.Y.

2011) (Stein, D.J.); Prime Mover Capital Partners, L.P. v. Elixir

Gaming Techs., Inc., 793 F. Supp. 2d 651, 674 (S.D.N.Y. 2011)

(Kaplan, D.J.); Barron Partners, LP v. LAB123, Inc., 593 F. Supp.

2d 667, 674-75 (S.D.N.Y. 2009) (Rakoff, D.J.).  Defendants'

superior knowledge with respect to the loan files that were

ultimately included in the trusts does not alter this result.

Fed. Hous. Fin. Agency v. UBS Americas, Inc., supra, 858 F. Supp.

2d at 335; MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,
supra, 87 A.D.3d at 297, 928 N.Y.S.2d at 235-36.

      "The elements of fraudulent concealment under New York
law are:  a relationship between the contracting parties that
creates a duty to disclose, knowledge of the material facts by
the party bound to disclose, scienter, reliance, and damage."
Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 582
(2d Cir. 2005), citing Cong. Fin. Corp. v. John Morrell & Co.,
790 F. Supp. 459, 472 (S.D.N.Y. 1992) (Patterson, D.J.).  The
relationship necessary to sustain a fraudulent concealment claim
can arise where there is a fiduciary relationship between the
parties or "where one party possesses superior knowledge, not
readily available to the other, and knows that the other is
acting on the basis of mistaken knowledge."  Aaron Ferer & Sons
Ltd. v. Chase Manhattan Bank, Nat. Ass'n, 731 F.2d 112, 123 (2d
Cir. 1984); accord Lerner v. Fleet Bank, N.A., 459 F.3d 273, 292
(2d Cir. 2006); In re Autohop Litig., 12 Civ. 4155 (LTS)(KNF),
2013 WL 5477495 at *13 (S.D.N.Y. Oct. 1, 2013) (Swain, D.J.).

      Plaintiffs' status as a buyer of trust certificates did
not create a fiduciary relationship with defendants.  Brass v.
Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) ("A duty
to speak cannot arise simply because two parties may have been on
opposite sides of a bargaining table when a deal was struck

between them, for under New York law the ancient rule of <u>caveat emptor</u> is still alive and well."). In addition, the complaint does not allege that defendants knew plaintiffs were acting on the basis of mistaken knowledge.[14]

Accordingly, plaintiffs' claims for negligent misrepresentation and fraudulent concealment should also be dismissed.

## 10.  Aiding and Abetting

Finally, plaintiffs' claim that some of the defendants aided and abetted a fraud perpetrated by the other defendants should also be dismissed.

The elements of a claim for aiding and abetting a fraud are:  "(1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."  <u>Lerner v. Fleet Bank, N.A.</u>, <u>supra</u>, 459 F.3d at 292 (citations and brackets omitted); <u>accord</u> <u>VNB Realty, Inc. v. Bank of Am. Corp.</u>, 11 Civ. 6805 (DLC), 2013 WL 5179197 at *12 (S.D.N.Y. Sept. 16, 2013) (Cote, D.J.).

---

[14]As noted above, the complaint alleges that plaintiffs retained two firms to perform a due diligence review for plaintiffs with respect to the trust certificates (Compl. ¶¶ 192-99).  The complaint does not allege that the results of this review were shared with defendants.

Because plaintiffs have failed to state a claim for fraud, the aiding-and-abetting claim also fails.  Union Cent. Life Ins. Co. v. Credit Suisse Secs. (USA), LLC, supra, 2013 WL 1342529 at *10; Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC, 12 Civ. 3723 (RJS), 2013 WL 1294668 at *15 (S.D.N.Y. Mar. 28, 2013) (Sullivan, D.J.); Marketxt Holdings Corp. v. Engel & Reiman, P.C., 693 F. Supp. 2d 387, 393, 396 (S.D.N.Y. 2010) (Kaplan, D.J.) (dismissing aiding and abetting claim where plaintiffs failed to allege a primary violation).

## IV.  Conclusion

Accordingly, for all the foregoing reasons, I respect-fully recommend that defendants' motion to dismiss the complaint be granted.

## V.  OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c)) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Lewis A. Kaplan, United States District Judge, 500 Pearl Street,

Room 2240, and to the Chambers of the undersigned, 500 Pearl

Street, Room 750, New York, New York 10007.  Any requests for an

extension of time for filing objections must be directed to Judge

Kaplan.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT

IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.

Thomas v. Arn, 474 U.S. 140, 155 (1985); United States v. Male

Juvenile, 121 F.3d 34, 38 (2d Cir. 1997); IUE AFL-CIO Pension

Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v.

Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        February 28, 2014

                              Respectfully submitted,


                              _____
                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Joel H. Bernstein, Esq.
Mark S. Arisohn, Esq.
Barry M. Okun, Esq.
Labaton Sucharow, LLP
140 Broadway
New York, New York  10005

Roger A. Cooper, Esq.
Shiwon Choe, Esq.
Cleary Gottlieb Steen & Hamilton, LLP
One Liberty Plaza
New York, New York  10006